# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
## December 14, 2010 Session

## STATE OF TENNESSEE v. ANTHONY D. FORSTER

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-B-1181      Seth Norman, Judge**

_____

**No. M2002-0008-CCA-R3-CD - Filed April 12, 2011**

_____

A Davidson County grand jury indicted the Defendant, Anthony D. Forster, for four counts of robbery related charges stemming from two incidents. The Defendant was convicted of one count of especially aggravated robbery, acquitted on the remaining charges, and the trial court sentenced the Defendant to twenty-two years in prison. On appeal, the Defendant claims that:(1) the Defendant was denied his right to a speedy trial; (2) the evidence was insufficient to support his conviction; (3) the trial court erred in failing to sever the offenses; (4) the trial court erred in failing to compel the State to comply with Rule 16 of the Tennessee Rules of Criminal Procedure; and (5) the trial court improperly sentenced the Defendant. After a thorough review of the record and the applicable law, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which DAVID H. WELLES and J.C. McLIN, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the Appellant, Anthony D. Forster.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; Pamela Anderson, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
## I. Background
## A. Procedural History

This case arises from two robberies that occurred on June 18, 1997. In December

1997, a Davidson County grand jury indicted the Defendant for one count of aggravated robbery, two counts of aggravated assault, and one count of robbery for his alleged participation in two Nashville robberies occurring at West Meade Cleaners and an Arby's restaurant. In June 2000, the State issued a superseding indictment charging the Defendant with one count of aggravated robbery and two counts of aggravated assault, for the events occurring at West Meade Cleaners, and one count of especially aggravated robbery for the events occurring at the Arby's restaurant. Following the September 2000 trial on these charges, the jury convicted the Defendant of especially aggravated robbery of the Arby's restaurant and acquitted the Defendant as to the remaining charges for the events occurring at West Meade Cleaners. The trial court sentenced the Defendant to twenty-two years for the especially aggravated robbery conviction.

The Defendant filed a direct appeal, and a motion for appointment of counsel for the appeal. This Court denied the Defendant's motion for appointment of counsel based upon his relinquishment of his right to counsel at the trial court. On direct appeal, this Court affirmed his conviction. *See State v. Anthony D. Forster*, M2002-00008-CCA-R3-CD, 2003 WL 1715922, (Tenn. Crim. App., at Nashville, Apr. 1, 2003), *perm. app. denied* (Tenn. Oct. 13, 2003). The Defendant filed a petition for post-conviction relief, which the post-conviction court summarily dismissed. The Defendant appealed the dismissal of his post-conviction petition, and this Court affirmed the dismissal. *See Anthony D. Forster v. State*, M2004-00452-CCA-R3-PC, 2005 WL 1521841 (Tenn. Crim. App., at Nashville, June 24, 2005), *no perm. app. filed.*

Having exhausted state remedies, the Defendant then filed a petition for habeas corpus relief, alleging that he was denied his Fourteenth Amendment right to appellate counsel. The Sixth Circuit Court of Appeals held that this Court unreasonably applied Federal law when it inferred that the Defendant waived his Fourteenth Amendment right to appellate counsel based upon his waiver of his Sixth Amendment right to assistance of counsel at sentencing and remanded the case, requiring the State to reinstate the Petitioner's direct appeal or release him from custody. *See Forster v. Steward*, 360 Fed. Appx. 604, 2010 WL 21960 (C.A. 6 (Tenn)). The Defendant, now having counsel, has filed this direct appeal of his 2000 conviction. He claims that: (1) the trial court erred by denying the Defendant a speedy trial; (2) the evidence was insufficient to support his conviction; (3) the trial court erred when it denied the Petitioner's motion to sever the offenses; (4) the trial court erred when it failed to compel the State to comply with Tennessee Rule of Criminal Procedure 16; and (5) the trial court failed to properly consider applicable mitigating factors during sentencing.

## B. Facts

At trial, the following evidence was presented: Judy Dotson, a West Meade Cleaners

employee, testified that around 7:00 a.m. on June 18, 1997, she was helping a customer when a man came through the front door of the store and placed his arm around the customer's shoulder. Dotson initially thought the two were friends, but she realized otherwise when the man took a gun "out of a little pouch." As Dotson backed up and began to run, the armed man ordered her to stop, but Dotson continued and fled through the side door of the building. Once outside, Dotson ran to the front of the store where a blue car was parked, and she asked the passenger in the car, a black man with curly hair and long sideburns, to call 911 because the store was being robbed. The passenger reached for the door handle, but instead honked the car horn. Dotson realized that the car was associated with the robbery, and she ran to a bagel shop and asked them to call 911. Dotson was unable to identify the man from the robbery in a police photographic line-up, but described him to the jury as black and "a very big guy."

On cross-examination, Dotson testified that the man who robbed the store wore a white shirt, with a patch that read "Tony," and dark pants. Dotson said that she was not "positive" the patch said "Tony" but, because Dotson's son-in-law is named "Tony," she recalled that name. Dotson acknowledged that she had not previously told anyone that the patch on the robber's shirt read "Tony."

Patricia Greer, a manager at West Meade Cleaners, testified that on the morning of June 18, 1997, she noticed a blue car pull into the store parking lot and park next to her vehicle. Because they were short-staffed that day, Greer went to the front of the store to see if Dotson needed help, and she saw an armed man pushing a customer to the ground and Dotson backing away. Greer described the armed robber as a black man who was fairly tall and "heavyset" with curly hair. She said the man was wearing blue shorts, a light blue uniform shirt, and a black fanny pack. Greer told Dotson to run and the armed man grabbed Greer, pushed her into the wall, and hit her with his gun. The man instructed Greer to give him money, so she opened the register, and the man grabbed the cash drawer, took $100 in cash and a "bad check," and threw the cash drawer on the ground. Greer recalled that after she heard a car horn, the man backed toward the front door and left in the blue car. As soon as the man left, Greer slid down behind the cash register and called 911.

On cross-examination, Greer testified that she was unable to identify the Defendant as the armed robber in a police photographic line-up on the day of the robbery. Greer said that she told police officers that the armed robber hit her arm but that police did not photograph the bruising. Greer did not seek medical attention for the bruising.

Teresa Obispado, testified that in June 1997 she worked at Arby's restaurant. On the day in question, Obispado arrived at work at 7:00 a.m. to prepare for the day. At approximately 9:30 a.m., Obispado was coming out of the bakery area of the store when a

co-worker told her the store was being robbed. Obispado pushed the panic button and saw a large, tall black man, whom she later identified as the Defendant, enter from the backdoor, which was standing open for an employee who was unloading restaurant supplies from a truck. Obispado recalled that the Defendant came toward the front of the restaurant with the manager, picked up fry baskets, and "acted like he was going to swing, but then he just set them down." The Defendant screamed at the manager that he wanted money. Obispado noticed that there was blood on the side of the manager's face. After the Defendant took money from the registers, he ordered the manager to lay on the ground. Obispado testified that, on the same day of the robbery, she identified the Defendant as the robber in a police photographic line-up.

Betty Kidwell, an Arby's restaurant employee, confirmed that on the day of the robbery the back door of the restaurant was standing open because another employee was unloading a truck and stocking the products. Kidwell heard a commotion in the office, so she looked in and saw the store manager and another man who she described as "a big guy." The Defendant pointed his finger at Kidwell, indicating she was not to move, so she continued preparing food for the restaurant. Kidwell could not see what was happening while they were in the office, but, after they exited, the Defendant "jerked . . . up" a mop bucket sitting on the floor as if "he was going to hit [the manager] with it." The Defendant, however, set the bucket back down. When the two headed for the front of the store, Kidwell ran out the back door of the restaurant to a pay phone to call 911.

While Kidwell was outside, she noticed another man standing outside, and then she saw the Defendant exit the store and the two men got into a dark blue car and left. Kidwell wrote down the license number of the vehicle and provided it to police. Unlike two other witnesses to the robbery, Kidwell was unable to identify the Defendant in a photographic line-up. After the incident, Kidwell saw the manager and noticed a cut along her cheekbone.

Sandra Christian, an Arby's restaurant manager, testified that, as one of the employees unloaded a shipment of supplies that morning through the back door, she realized that part of the shipment was missing. Christian went into the restaurant office to make a phone call to the distributor about the missing items. She described the office phone as an older model portable phone, "like an army field phone, a big heavy type." In explaining how heavy the phone was, Christian said that the phone held four "C" batteries in the receiver. Christian was on the phone when the Defendant entered the office behind Christian. The Defendant put his arm around Christian and ordered her to open the restaurant safe. Christian recalled that the Defendant's grip tightened so that she could not breathe. The Defendant grabbed the phone from Christian's hand, "drew back with all his weight," and hit her with the phone, knocking the glasses off her face and causing her to fall back onto the office desk. Christian recalled that she was "frightened and afraid [she was] going to die." After sustaining the

-4-

blow, Christian steadied herself, and the Defendant said, "I'm not kidding with you." While trying to open the safe, Christian could feel her face bleeding. Christian recalled having some difficulty opening the safe, and the Defendant becoming impatient with her. Once she opened the safe, the Defendant realized there were no cash drawers. He shoved Christian down and then grabbed her by the arms and instructed her to take him to the cash drawers after he took rolls of change from the safe.

As the Defendant and Christian exited the office to go to the cash drawers at the front of the store, Christian saw Obispado, but ignored her because the Defendant appeared not to have seen Obispado. Christian opened a cash drawer, and the Defendant took the money from the drawer. At the second cash drawer, Christian was not moving quickly enough, so the Defendant picked up a fry basket and threw it, but it did not hit Christian. The Defendant took the cash from the second drawer and ordered Christian to lay on the floor. Christian estimated that the Defendant took approximately three hundred dollars from the cash drawers and recalled that he threatened to kill Christian if she got up and exited the store.

Christian described the injuries she received as a result of the robbery, saying that she suffered bruising on her arm from the Defendant "pulling" her around and also sustained a laceration on her face from his hitting her with the cordless phone. This laceration, which caused swelling for nearly a week, required a butterfly bandage, and a visible mark from the injury remained for months. At the time of trial, three years after the injury, Christian said she still bore a scar that went from the middle of the bridge of her nose down to her lip area. Christian said that the scar had faded over time but said, "[I]t's still there." Christian identified the Defendant in a police photographic lineup.

James Michael Chastain, a Metropolitan Nashville Police Department detective, testified that on his way to work he heard on his police radio a description of a suspect and vehicle, described as small and either black or blue, wanted in association with a robbery that occurred at West Meade Cleaners. Soon after he arrived at the police station, he heard another dispatch call indicating that a second robbery had occurred at an Arby's restaurant, and the vehicle description provided was similar to the vehicle described from the West Meade Cleaners robbery. This dispatch provided a license tag number for the vehicle associated with the Arby's robbery.

Detective Chastain, using the license tag number, determined that the vehicle was a blue four-door Subaru belonging to the Defendant. Based upon this information, the detective created a photographic line-up and, shortly after the robbery, showed it to witnesses of the Arby's restaurant robbery. Two of the witnesses positively identified the Defendant as the perpetrator of the robbery, and the detective sought an arrest warrant for the Defendant based upon these identifications. The detective also showed the line-up to witnesses of the

West Meade Cleaners robbery based upon the similarity of the descriptions of the suspects and vehicles involved in the two robberies, but neither witness to the West Meade Cleaners robbery could positively identify the Defendant.

Police took the Defendant into custody the following morning, and Detective Chastain conducted a videotaped interview with the Defendant, which was shown to the jury. In the interview, the Defendant said his girlfriend gave him $125 to pay his bond for a vandalism charge and explained that he was in a "predicament" because he had no job and no place to stay. Instead of paying his bond, he ultimately used all the money to purchase and use illegal drugs. The Defendant said that he realized that he had to get the money for his bond and "the quickest way was to go out and do what [he] did." The Defendant said that he only remembered committing one robbery, the one at the Arby's restaurant, and maintained that he did not recall robbing the West Meade Cleaners. The Defendant said he was unclear on the location of the robbery and some of the details because he was high at the time it occurred. He did recall, however, that, he wore a purple Gatlinburg t-shirt and blue shorts and carried a hair brush wrapped in a navy blue towel at waist level during the robbery. The Defendant estimated that he took approximately $200 during the robbery and that at approximately 3:00 p.m. the day of the robberies, he knew "he'd done wrong," so he confessed to his sister what he had done. When the detectives asked, the Defendant initially denied ever having been in possession of a bad check, such as the one witnesses to the West Meade Cleaners robbery said was taken from a cash drawer, but later in the interview admitted he found a "piece of paper with a stamp on it" that was in a white envelope. He said that he tore it up and threw it out of the vehicle window after he fled from the robbery.

Based upon the Defendant's recollection of throwing the white envelope out the window, the detectives took the Defendant to the area where the Defendant believed he had tossed the "bad check," but they did not find it. He then directed the detectives through the course that he drove on the day of the robberies. The Defendant instructed the detectives to exit I-40 onto Charlotte Pike and then to turn onto Davidson Street. The Defendant pointed at the West Meade Cleaners and said, "It's right in here." The detective pulled into the dry cleaners parking lot and asked the Defendant where he had parked the previous day, and the Defendant identified the same parking space that witnesses said the man who robbed West Meade Cleaners had parked.

On cross-examination, Detective Chastain agreed that the Defendant was "cooperative" during the course of the investigation and that the Defendant allowed the Detective to search his apartment during which the detective did not find any money or firearms. He agreed that, during the interview with the Defendant, he learned that the Defendant had a drug addiction.

Tracy Woods, the Defendant's ex-girlfriend, testified on the Defendant's behalf. Woods said she had broken up with the Defendant shortly before the robberies and spoke with him over the telephone on the day of the robberies. Woods recalled that the Defendant called her early in the morning and asked her to pick him up at a convenience store because his car was broken down. Woods said the Defendant was standing by the pay phone alone when she arrived. Woods spoke with the Defendant for a few minutes and then some men, who were driving the Defendant's car, pulled up. Woods said that she was angry because she thought the Defendant was "stranded and then [she] saw that he wasn't," and so she left.

On cross-examination, Woods testified that she learned of the robberies the day after she spoke with the Defendant and that she never came forward to tell anyone about her interaction that day with the Defendant.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred by denying the Defendant a speedy trial; (2) the evidence was insufficient to support his conviction; (3) the trial court erred when it denied the Petitioner's motion to sever the offenses; (4) the trial court erred when it failed to compel the State to comply with Tennessee Rule of Criminal Procedure 16; and (5) the trial court failed to properly consider applicable mitigating factors during sentencing.

### A. Right to a Speedy Trial

The Sixth Amendment to the United States Constitution and the Tennessee Constitution provides a defendant with the right to a speedy trial. U.S. Const. Amend. VI; Tenn. Const. Art. I, § 9. The purpose of the right to a speedy trial is to protect defendants from "oppressive pre-trial incarceration, anxiety and concern of the accused, and the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence." *Doggett v. United States*, 505 U.S. 647, 654 (1992).

In *Barker v. Wingo*, 407 U.S. 514 (1972), the United States Supreme Court developed a four-prong balancing test to determine whether a defendant has been deprived of the right to a speedy trial. The four factors considered are the length of the delay, the reasons for the delay, the defendant's assertion of the right, and the prejudice suffered by the defendant. *Id*. at 530. The delay must approach one year to trigger the *Barker v. Wingo* analysis, the line of demarcation depends on the nature of the case. *State v. Utley*, 956 S.W.2d 489, 494 (Tenn. 1997).

In this case, the Defendant was indicted in December 1997, and the Defendant's trial

was in September 2000. This delay warrants a further examination of the specific circumstances of this particular case in light of the remaining three *Barker* factors. We would note, however, that this factor should not weigh heavily against the State, as a three-year delay from indictment to trial is not excessive in light of other cases. *See State v. Simmons*, 54 S.W.3d 755, 759 (Tenn. 2001); *compare Doggett*, 505 U.S. at 647 (six-year delay); *State v. Wood*, 924 S.W.2d 342 (Tenn. 1996) (thirteen-year delay); *State v. Ricky E. Hutchings*, No. M2008-00814-CCA-R3-CD, 2009 WL 1676057, at *5 (Tenn. Crim. App., Nashville, Feb. 10, 2009) (eight-year delay) *no perm. app. filed*.

The next factor to be considered is the reason or reasons for the delay, which should be "neutral." *Barker*, 407 U.S. at 531. In *State v. Wood*, our Supreme Court identified four possible reasons for delay, they include:

> (1) Intentional delay for tactical advantage or to harass the defendant;

> (2) bureaucratic indifference or negligence;

> (3) necessary delay for the fair and effective prosecution of the case; and

> (4) delay agreed to or caused by the defendant.

*State v. Wood*, 924 S.W.2d 342 (Tenn. 1996). In this case, the Defendant does not contend that the delay was due to the State's intentional act to gain advantage or harass him or bureaucratic indifference or negligence. We, likewise, do not find that the record indicates such action by the State. The Defendant asserts in his brief that the reasons for the delay "are difficult to assess properly from the record." He then goes on to explain that despite the multiple motions to withdraw by Defendant's counsel in the record, "[H]e wished to proceed to trial as quickly as possible, but his counsel chose for their own reasons to withdraw as his attorney." The State does not contend that the delay was necessary for the fair and effective prosecution of the Defendant's charges; rather, it asserts that the delay was caused by the Defendant's unwillingness to work with multiple attorneys.

Our review of the record reveals that the Defendant was represented by Stephen Young at his January 7, 1998, arraignment. The February 13, 1998, court minutes reflect his attorney was Jerilyn Manning. On February 26, 1998, Manning filed a motion to be relieved, claiming that the Defendant's "confidence" was so eroded that representation would be inappropriate. The March 5, 1998, court minutes reflect Tony Adgent as the Defendant's counsel. Adgent filed a motion to be relieved on July 16, 1998, also noting client relation difficulty and specifically asserting that he was filing the motion at the Defendant's request. On July 24, 1998, Terry Canady was appointed and, by March 22, 1999, also requested to

withdraw as counsel. Canady's motion was based upon the Defendant's unwillingness to work with counsel and described the Defendant as "hostile and aggressive" toward counsel. On March 26, 1999, Canady was relieved and the court minutes reflect Tommy Longaberger as counsel. On February 3, 2000, John Oliva filed a notice of appearance on behalf of the Defendant. The Defendant's trial began September 18, 2000, and, shortly thereafter, on October 18, 2000, Oliva filed a motion to be relieved citing the deterioration of the attorney-client relationship. The motion was granted and Nicholas Hare was appointed on November 22, 2000. The following March and August of 2001, the Defendant filed a pro se motion requesting that Hare be removed as counsel. The trial court denied the first request. The Defendant's second request was followed by a motion to withdraw from Hare as well who described the attorney-client relationship as "irretrievably damaged." The trial court took the motions under advisement and on October 9, 2001 granted the motion but ordered Hare to remain on the case as "elbow counsel."

As for the Defendant's role in the continuances, we conclude that the Defendant's unwillingness to work with counsel as evidenced by five different motions to withdraw from five different attorneys which all state difficulties in the attorney-client relationship indicates that the Defendant was largely responsible for the continuances. The delays due to change of counsel benefitted the Defendant in that he was able to proceed to trial with an attorney he retained and apparently felt more comfortable with at the time of trial. Because the Defendant caused the continuances, the reason for the delay weighs against the Defendant.

A defendant's assertion of his speedy trial right, while not required, is "entitled to strong evidentiary weight." A defendant's agreement to continuances after a speedy trial request, however, will diminish the weight given this factor. *Barker*, 407 U.S. at 521; *State v. Hugh Peter Bondurant, Jr.*, No. M1998-00494CCA-R10CD, 1999 WL 1209514, at *6 (Tenn. Crim. App., at Nashville, Dec. 17, 1999), *no perm. app. filed*. The Defendant filed a motion for a new trial date in November 1998. At the time of this motion, the trial was already set for March 22, 1999. However, due to the Defendant's unwillingness to work with his counsel at that point in the case, counsel requested to be relieved and the trial court granted the motion. Thereafter, the Defendant retained his own counsel in February 2000, and the Defendant's trial began in September. Because of the Defendant's role in the delay after he asserted his speedy trial right, his agreement negated his assertion of his right to a speedy trial. *See State v. Lewis*, No. M2005-02279-CCA-R3-CD, 2006 WL 2738160, at *3 (Tenn. Crim. App., at Nashville, Sept. 26, 2006), *Tenn. R. App. P. 11 application denied* (Tenn. Jan. 29, 2007).

Finally, we consider the prejudice to the Defendant caused by the delay in light of the interests protected by the speedy trial right. *Barker*, 407 U.S. at 532. The U.S. Supreme Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii)

to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. *Id*. The Defendant asserts that the delay impaired his defense because he was incarcerated while he awaited trial, the State issued a superseding indictment in the interim, and "the memory of [ ] witnesses faded as time went on." Our review of the record reveals that the prejudice in this case is minimal. Although the Defendant may have been prejudiced, to some degree, by his pre-trial incarceration, there is no claim of unavailability of a witness due to the delay. The transcript reveals minor lapses in memory of the Defendant's witness, but nothing that we can conclude was significant to the outcome of the trial.

While the delay was sufficient to trigger a *Barker* inquiry, the Defendant has failed to establish a meritorious claim for a speedy trial violation. Accordingly, the Defendant is not entitled to relief as to this issue.

## B. Sufficiency of the Evidence

The Defendant challenges the sufficiency of the evidence based pertaining to two elements of especially aggravated robbery. The Defendant asserts that the State failed to prove that he used a deadly weapon against Christian and that he inflicted serious bodily injury upon Christian. The State responds that there was sufficient evidence presented to the jury to sustain an especially aggravated robbery conviction.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v.*

*State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of especially aggravated robbery, which requires "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" and is "accomplished with a deadly weapon; and where the victim suffers serious bodily injury." T.C.A. §§ 39-13-401, -403 (2009). "'Serious bodily injury' means bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." T.C.A. § 39-11-106(a)(34) (2009). "Deadly weapon," as applicable in this case, means "Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." T.C.A. § 39-11-106(a)(5)(B) (2009).

Our review of the record reveals that the evidence was sufficient for the jury to find the Defendant guilty, beyond a reasonable doubt, of especially aggravated robbery. The Defendant admitted during a videotaped interview that he committed a robbery at the Arby's restaurant during which he took approximately $200. Two witnesses of the robbery

identified the Defendant in a photographic line up shortly after the robbery, and the Defendant's vehicle tag number was taken at the scene of the crime. After entering the restaurant before store hours through an open back door, the Defendant grabbed Christian, the store manager, from behind and ordered her to open the safe. At this time, Christian was holding a large, heavy phone that the Defendant grabbed from her hand, "drew back with all his weight," and hit Christian in the face with a force that knocked off and broke her glasses and caused her to fall back on her desk. Christian felt blood on her face, but she followed the Defendant's orders to open the safe fearing for her safety and her life. Finding only change rolls in the safe, the Defendant then ordered Christian to open the cash registers in the front of restaurant. She again complied with the Defendant's orders and, after the Defendant took the money from two cash registers, he told Christian to get onto the floor and he left the restaurant. Christian sought medical treatment for the laceration caused by the Defendant's blow and, although the scar had faded to some degree during the subsequent three years since she sustained the injury, at trial she still bore a visible scar from the middle of the bridge of her nose down to her lip area.

In this appeal, the Defendant specifically challenges the element of serious bodily injury, claiming the State failed to present evidence that, due to the Defendant's conduct, Christian was at risk to lose her life, that she suffered "protracted unconsciousness or permanent loss or impairment of any bodily member, organ or mental faculty,[or that she was] . . . permanently disfigured." In addition to the factors the Defendant lists in his brief, serious bodily injury may also be established by a "protracted or obvious disfigurement" which is the theory the State proceeded on at trial. T.C.A. § 39-11-106(a)(34)(D). Three years after the Defendant inflicted the injury, Christian still had a scar running from the middle of the bridge of her nose down to her lip area. The jury saw this scar at trial, and we conclude the scar was sufficient to establish the element of serious bodily injury. *See State v. Clay B. Sullivan*, No. M2004-03068-CCA-R3-CD (Tenn. Crim. App., at Nashville, Mar. 10, 2006) (holding two-inch scar was sufficient for finding of protracted and obvious disfigurement), *no Tenn. R. App. P. 11 application filed* ; *see also State v. Shanda Alene Wright*, M2006-02343-CCA-R3-CD, 2008 WL 371258 (Tenn. Crim. App., at Nashville, Feb. 11, 2008), *perm. app. denied* (Tenn. Oct. 27, 2008) (holding scars sufficient to establish serious bodily injury).

The Defendant also claims the State failed to prove that he used a deadly weapon during the course of the robbery. Our Supreme Court has characterized deadly weapons as either deadly per se or deadly by reason of the manner in which the item is used. *Morgan v. State*, 415 S.W.2d 879, 882 (Tenn. 1967); *See also* T.C.A. § 39-11-106(5). Even if an item used is not deadly per se, it may be considered "deadly" where the defendant actually used or intended to use the item to cause death or inflict serious bodily injury. *See State v. McGouey*, 229 S.W.3d 668, 674 (Tenn. 2007). In *Morgan*, the court held that "a hard object"

used as "a bludgeon or club to assault" a victim is a deadly weapon within the meaning of the robbery statute. *Morgan*, 415 S.W.2d at 882.

In the present case, we conclude that the jury properly determined that the heavy cordless telephone that the Defendant used to forcibly hit Christian in the face was a deadly weapon. Christian testified that the Defendant took the heavy phone from her hand and then "drew back with all his weight" to hit her with such force that it knocked her glasses off her face and physically pushed her body back onto the desk. The laceration caused by the Defendant's actions left a scar that still remained three years after the incident. Based upon this evidence, we conclude that a jury could find, beyond a reasonable doubt, that the Defendant committed especially aggravated robbery. As such, the Defendant is not entitled to relief as to this issue.

### C. Motion to Sever

The Defendant next alleges that the trial court erred when it denied his motion to sever the offenses so that they could be tried separately. The State counters that the trial court properly refused to sever the robbery offenses because the Defendant's motive for the robberies, to obtain bail money, constituted a continuing plan.

A trial court's denial of a motion for severance will be reversed only when there has been an abuse of discretion. *See State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). This Court will not interfere with the exercise of this discretion unless it appears on the face of the record that the accused was prejudiced by the trial court's ruling. *State v. Wiseman*, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982). Whether severance should be granted "depends upon the facts and circumstances involved in the various crimes that are charged." *State v. Morris*, 788 S.W.2d 820, 822 (Tenn. Crim. App. 1990).

Rules regarding the consolidation and severance of offenses are included in the Tennessee Rules of Criminal Procedure. Rule 8(b) of the Tennessee Rules of Criminal Procedure, which allows for the permissive joinder of offenses, states: "Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character." Tenn. R. Crim. P. 8(b). Rule 13(a) provides as follows: "The court may order consolidation of two or more indictments, presentments, or informations for trial if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8." Tenn. R. Crim. P. 13(a).

Nonetheless, Rule 14 of the Tennessee Rules of Criminal Procedure states that "[i]f

two or more offenses have been joined or consolidated for trial . . . the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." Tenn. R. Crim. P. 14(b)(1). To avoid severance, both portions of the rule must be satisfied. *See State v. Hallock*, 875 S.W.2d 285, 289 (Tenn. Crim. App. 1993).

### 1. Common Scheme or Plan

The first prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure requires that the trial court find a common scheme or plan. In Tennessee, three categories of evidence may be used to establish the existence of a common scheme or plan: (1) evidence showing a distinctive design or signature crime; (2) evidence demonstrating a larger, continuing plan or conspiracy; and (3) evidence that the offenses are part of the same transaction. *State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999). "Before multiple offenses may be said to reveal a distinctive design, . . . the 'modus operandi employed must be so unique and distinctive as to be like a signature.'" *Id*. (quoting *State v. Carter*, 714 S.W.2d 241, 245 (Tenn. 1986)).

At the conclusion of the hearing on the motion to sever, the trial court found that, because each robbery was carried out by two perpetrators, the robberies evidenced a "modus operandi:"

> In both places we have, I suppose, a driver and a hold-up person, whatever you want to say, whether it's a theft person or a robbery person. I think that, in and of itself, regardless of all of the other significant factors–and identification doesn't play any part in the question of severance. It is the plan or the modus operandi of the perpetrators.

Based upon its finding, the trial court ordered that the cases be joined for trial. We cannot agree with the trial court that the modus operandi in this case is "so unique and distinctive as to be like a signature." *See Moore*, 6 S.W.3d at 240. The fact that the Defendant entered a business while another individual remained outside is not so unique as to establish a distinctive design in the criminal conduct.

Alternatively, we also consider the State's argument, that the larger, continuing plan exception was applicable because the Defendant's motive for both robberies was to obtain bond money which constitutes a continuing plan. The State's theory that, because the Defendant's motive in both robberies was to obtain bond money, absent more, is not a sufficient basis on which to deny severance. *See Hallock*, 875 S.W.2d at 290 (Tenn. Crim. App. 1993).

-14-

## 2. Evidence of One Offense Admissible in the Trial of the Other Offense

The second prong of Rule 14(b)(1) of the Tennessee Rules of Criminal Procedure is what the Tennessee Supreme Court has deemed the "primary inquiry" in any severance case: whether the evidence of one offense would be admissible in the trial of the other if the two offenses remained severed. *State v. Burchfield*, 664 S.W.2d 284, 286 (Tenn. 1984). The Court has stated that "'[u]nless [it is] expressly tied to a relevant issue, evidence of a common scheme or plan can only serve to encourage the jury to conclude that since the defendant committed the other crime, he also committed the crime charged.'" *Moore*, 6 S.W.3d at 239 n.5 (quoting *Hallock*, 875 S.W.2d at 292).

The court has also stated that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." *Id.* at 240 n.7. Thus, Tennessee Rule of Evidence 404(b) is relevant to our analysis of this issue. Rule 404(b) excludes evidence of "other crimes, wrongs, or acts" committed by the defendant when offered only to show the defendant's propensity to commit the crime charged. *See* Tenn. R. Evid. 404(b). Generally, evidence that the accused committed crimes independent of those for which he is on trial is inadmissible because such evidence lacks relevance and invites the finder of fact to infer guilt from propensity. *See Moore*, 6 S.W.3d at 239; *see also* Tenn. R. Evid. 404(b).

However, evidence of other crimes, wrongs, or acts may be admissible for other purposes, such as "to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue." *Moore*, 6 S.W.3d at 239 n.5 (quoting *Hallock*, 875 S.W.2d at 292). Offenses that are part of a common scheme or plan are typically offered to establish the identity of the perpetrator. *Id.* at 239. As the Tennessee Supreme Court has noted, "[I]dentity is usually the only relevant issue supporting admission of other offenses when the theory of the common scheme or plan is grounded upon a signature crime." *Id.*

The trial court, in this case, failed to address the second prong of the inquiry. We must now determine whether evidence of one offense would be admissible in the trial of the other if the offenses had been severed. After a thorough review, we cannot conclude that evidence of the West Meade Cleaners robbery would have been admissible in the trial of the Arby's robbery had the offenses been severed. As previously discussed, the robberies were not so distinctive as to constitute a "signature" that would establish the Defendant's identity. The State failed to offer evidence of motive beyond its minimal assertion that the Defendant needed bond money, and nothing was raised at trial that required rebuttal of an accident or mistake. Our Court has said, "It frequently happens that two distinct offenses are so inseparably connected that the proof of one necessarily involves proving the other." *Hallock*,

875 S.W.2d at 290 (quoting *Mays v. State*, 238 S.W. 1096, 1102 (1921)) There are no issues apparent in the record that would have necessitated proof from one of the robberies to establish the other. And we do not find that the evidence is admissible to establish some other relevant issue. We therefore conclude that the trial court erred by consolidating the cases for trial.

A trial court's error in denying a severance under Tennessee Rule of Criminal Procedure 14(b)(1), however, will be reversed only if the defendant can show that the error more probably than not affected the judgment. *See Moore*, 6 S.W.3d at 242; *see also* Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). In most severance cases, "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which proof exceeds the standard required to convict.'" *Moore*, 6 S.W.3d at 242 (quoting *Delk v. State*, 590 S.W.2d 435, 442 (Tenn. 1979)); *see also Shirley*, 6 S.W.3d at 250. In this case, overwhelming proof was presented of the Defendant's guilt of the Arby's crime. Both Christian and another witness identified the Defendant in a police photographic lineup shortly after the robbery. A license tag number for the vehicle used during the robbery was given to police, who later connected it to the Defendant. Furthermore, the Defendant confessed to the robbery at Arby's. Because the evidence in this case was more than sufficient to support the Defendant's convictions, we cannot conclude that the denial of a severance more probably than not affected the outcome of the trial. *See* Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b). We thus conclude that the trial court's error in refusing to sever the offenses was harmless. The Defendant is not entitled to relief on this issue.

### D. Failure to Supply Christian's Medical Record

The Defendant claims that the trial court erred when it failed to compel the State to provide him Christian's medical records. The State responds that, because the Defendant failed to raise this issue in his motion for new trial, it is now waived.

Tennessee Rule of Criminal Procedure 16 describes the procedure for the State's disclosure of evidence:

(a) Disclosure of Evidence by the State.
(1) Information Subject to Disclosure.

. . .

(F) Documents and Objects. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions

thereof, if the item is within the state's possession, custody, or control and:

>   (i) the item is material to preparing the defense;

>   (ii) the government intends to use the item in its case-in-chief at trial; or

>   (iii) the item was obtained from or belongs to the defendant.

(G) Reports of Examinations and Tests. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments if:

>   (i) the item is within the state's possession, custody, or control;

>   (ii) the district attorney general knows-or through due diligence could know-that the item exists; and

>   (iii) the item is material to preparing the defense or the state intends to use the item in its case-in-chief at trial.

A trial court has wide discretion to fashion an appropriate remedy based upon the circumstances of each case and the sanction must fit the circumstances of that case. *See State v. Leon Goins*, No. W1999-01681-CCA-R3-CD, 1999 WL 1531111, at *2 (Tenn. Crim. App., at Jackson, Dec. 27, 1999), *perm. app. denied* (Tenn. July 17, 2000). *Id.* (citations omitted); *see State v.James*, 688 S.W.2d 463, 466 (Tenn. Crim. App.1984). Whether a defendant has been prejudiced by the State's failure to disclose information is a significant factor in determining an appropriate remedy. *State v. Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). The Defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *State v. Brown*, 836 S.W.2d 557, 560 (Tenn. 1993).

In the Defendant's amendment to his motion for a new trial he stated the following:

The trial court erred permitting [sic] State's witness [Christian] to testify to medical terminology (concussion) fully knowing the State's failure to disclose favorable and/o[r] exculpatory materials requested timely pretrial by the [D]efendant.

We conclude that, in his motion for a new trial, the Defendant fairly raised the issue of whether the State complied with Rule 16. The evidence presented at the motion for new trial, however, does not support the Defendant's claim that the State failed to comply with Rule 16. The State did not use Christian's medical record at trial but relied upon Christian's own testimony as to what she experienced and the visible scar remaining on her face, and there is no evidence in the record that the State was in "possession, custody or control" of Christian's medical records. Further, to be entitled to relief, the Defendant must show that the failure to discover the medical records "hindered trial preparation and defense at trial." *See Brown*, 836 S.W.2d at 560. The Defendant has not done so. Thus, the Defendant is not entitled to relief as to this issue.

## E. Sentencing

The Defendant contends that the trial court erred when it sentenced him because it failed to consider mitigating factors. The State responds that the trial court did not err because the Defendant did not present any mitigating factors to the trial court at the sentencing hearing and, moreover, has failed upon appeal to identify mitigating factors the trial court should have considered.

When a defendant challenges the length, range or manner of service of a sentence, this Court must conduct a de novo review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2009). As the Sentencing Commission Comments to this section note, the burden is now on the appealing party to show that the sentencing is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts (2009). This means that if the trial court followed the statutory sentencing procedure, made findings of facts which are adequately supported in the record, and gave due consideration to the factors and principles relevant to sentencing under the Sentencing Act, the appellate court may not disturb the sentence even if a different result was preferred. T.C.A. § 40-35-103 (2009); *State v. Ross*, 49 S.W.3d 833, 847 (Tenn. 2001). The presumption does not apply to the legal conclusions reached by the trial court in sentencing a defendant or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Dean*, 76 S.W.3d 352, 377 (Tenn. Crim. App. 2001); *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994).

In conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn.

Code Ann. §§ 40-35-102, -103, -210; *see Ashby*, 823 S.W.2d at 168; *State v. Moss*, 727 S.W.2d 229 (Tenn. 1986).

Section 40-35-113 contains a non-exclusive list of mitigating factors that a trial court may apply to a defendant's sentence "if appropriate for the offense." T.C.A. § 40-35-113(2009). The burden of proving applicable mitigating factors rests upon the defendant. *State v. Moore*, No. 03C01-9403-CR-00098 (Tenn. Crim. App., at Knoxville, Sept. 18, 1995) *perm. app. denied* (Tenn. 1996).

The sentence to be imposed by the trial court for a Class A felony is presumptively the midpoint in the range when there are no enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. T.C.A. § 40-35-210(d), (e). The weight to be afforded an existing factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record. T.C.A. § 40-35-210, Sentencing Commission Comments; *Moss*, 727 S.W.2d at 237; *see Ashby*, 823 S.W.2d at 169.

The Defendant was convicted of especially aggravated robbery which is a Class A felony, and he was sentenced as a Range I offender for the Class A felony, which provides for a sentencing range of fifteen to twenty-five years. T.C.A. § 40-35-112(a)(1) (1997). The trial court sentenced the Defendant to twenty-two years. In considering mitigating factors, the trial court stated, "There have been no mitigating factors submitted to the Court and the Court finds no mitigating factors." Upon our review of the record, we agree with the trial court that there is no evidence in the record that supports the application of a mitigating factor in this case. The Defendant is not entitled to relief as to this issue.

The Defendant's brief implies that the trial court all together failed to consider mitigating factors. He argues that, because the Defendant was pro se, the trial court should have recognized his lack of exposure to statutory sentencing guidelines and considered mitigating factors regardless of the fact that the Defendant did not submit any mitigating factors for consideration. We note that, even though the Defendant elected to represent himself for the sentencing hearing, the trial court appointed him "elbow counsel", should he wish to seek legal advice. Further, the sentencing hearing transcript indicates that the trial court did consider mitigating factors, even though not submitted by the Defendant, and found none applicable in this case. The Defendant is, therefore, not entitled to relief on this issue.

### III. Conclusion

Based upon the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE